[Cite as *State v. Gardner*, 2011-Ohio-5692.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                      :          C.A. CASE NO.     24308

v.                                               :          T.C. NO.     10CR910

DAMAAD S. GARDNER                                :            (Criminal appeal from
                                                               Common Pleas Court)
    Defendant-Appellant                     :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___4th___ day of ___November___, 2011.

. . . . . . . . . .

TIMOTHY J. COLE, Atty. Reg. No. 0084117, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

REBEKAH S. NEUHERZ, Atty. Reg. No. 0072093, 150 N. Limestone Street, Suite 218, Springfield, Ohio 45501
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Defendant-appellant Damaad Gardner appeals from his conviction for possession of cocaine. For the following reasons, the judgment of the trial court is Reversed, and the case is Remanded.

I

{¶ 2} According to the testimony at the motion to suppress hearing, on the evening of March 17, 2010, Detective David House of the Dayton Police Department was patrolling in an unmarked cruiser in a high crime area, when he found himself behind a pick-up truck bearing out-of-county plates. Knowing that it is common for drug buyers to come from outside of Montgomery County to that area of Dayton to purchase illegal drugs, Detective House followed the truck. He checked the truck's registration through LEADS and learned that it was registered to a Clinton County man who had a 2003 conviction for a drug offense. Detective House continued to follow the truck to see if the driver was going to a known drug house.

{¶ 3} The driver parked the truck in the driveway of a residence. The driver and his passenger got out and entered the residence. Detective House decided to watch the house believing that a short stay could be indicative of drug activity. Seeing no suspicious activity, Detective House left after about fifteen minutes.

{¶ 4} Approximately three hours later, Detective House drove past the residence again. The truck was still in the driveway, along with a car. The car was registered to Richard Easter, who had an active warrant for his arrest from Butler County for failure to appear for trial on a drug charge. The LEADS system described Easter as a 56-year-old white male, approximately six feet tall, 160 pounds, with brown hair and brown eyes.

{¶ 5} Detective House moved up the street and resumed watching the house to see if Easter would emerge. Two younger (than Easter's listed age) men came out of the house. One, later identified as Gardner, sat in the passenger seat

of the car, and the other sat in the back seat. A few minutes later, at approximately 11:10 p.m., a man matching Easter's description came out of the house, got into the driver's seat of the car, and began to drive away. Detective House followed the car, and was going to call for a marked cruiser to conduct a stop to see whether the driver was Easter and, if so, to place him under arrest for the outstanding warrant.

{¶ 6} Before House was able to contact a marked cruiser, the driver turned into a gas station and parked, got out of the car, and walked up to the window and purchased cigarettes. Detective House, who was wearing a Dayton Police Department utility vest, parked 25 or 30 feet away and approached the driver. The man admitted that he was Richard Easter, and Detective House placed him under arrest. As Detective House was handcuffing Easter near the driver's door, he saw Gardner moving around inside the car, appearing to be ready to exit the car. Detective House walked Easter behind the car and around to the passenger side so that the detective could talk to the passengers. As the detective and Easter walked around the car, Detective House could see Gardner rise out of his seat and appear to reach into the back of his shorts. Concerned that Gardner might be armed, Detective House shouted for Gardner to place his hands on the dashboard, and Gardner did as told.

{¶ 7} Detective House had Easter sit on the ground with his back against the rear door and then tried to open the front passenger door, but it was locked. He ordered Gardner to get out of the car, and Gardner complied. Because he was still the only officer on the scene, Detective House handcuffed Gardner. Detective

House told Gardner that he was not under arrest and that he was being handcuffed for the officer's safety. Detective House conducted a pat down for weapons. He found no weapons, but he did feel something that he said he immediately recognized to be crack cocaine in Gardner's shorts. Detective House removed the item and placed Gardner under arrest. Before any Miranda warnings were given, Gardner spontaneously stated, "something to the effect 'He gave it to me to hide it.'" After other officers appeared on the scene, they took custody of Gardner and determined that he had an outstanding traffic warrant for his arrest.

{¶ 8} The trial court overruled the motion to suppress. Gardner pled no contest to one count of possession of cocaine and was sentenced to community control. Gardner appeals.

II

{¶ 9} Gardner's Assignment of Error:

{¶ 10} "THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS, FINDING THAT APPELLANT'S OUTSTANDING ARREST WARRANT CURED AN OTHERWISE ILLEGAL SEARCH."

{¶ 11} In his sole assignment of error, Gardner claims that the trial court should have granted his motion to suppress because the officer lacked reasonable, articulable suspicion of criminal activity to justify detaining him and patting him down. When assessing a motion to suppress, the trial court is the finder of fact, judging the credibility of witnesses and the weight of evidence. *State v. Jackson,* Butler App. No. CA2002-01-013, citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20. An appellate court must rely on those findings and determine "'without

deference to the trial court, whether the court has applied the appropriate legal standard.'" Id., quoting *State v. Anderson* (1995), 100 Ohio App.3d 688, 691. When the trial court's ruling on a motion to suppress is supported by competent, credible evidence, an appellate court may not disturb that ruling. Id., citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 592.

{¶ 12} Both the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect an individual's reasonable expectation of privacy from warrantless searches and seizures, subject only to a few narrow, well-defined exceptions. See, e.g., *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576; *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, fn 1.

{¶ 13} In overruling the motion, the court discussed, but specifically did not make factual findings, whether there was a reasonable, articulable suspicion to justify the pat down or whether the seizure resulted from the plain feel doctrine. Rather, the court held that when a valid warrant exists for a defendant's arrest, the individual has no reasonable expectation of privacy, and the exclusionary rule does not apply to exclude evidence that may have otherwise been unlawfully obtained by a police officer, even when the officer is not aware of the existence of the warrant until after the unlawful detention.

{¶ 14} In *Dayton v. Click* (Oct. 5, 1994), Montgomery App. No. 14328, discretionary appeal not allowed, (1995), 71 Ohio St.3d 1477, Click was the driver of a vehicle that, the court found, was stopped with "no reasonable suspicion that [he] was involved in criminal activity." He originally gave a false name and was

cited for driving without an operator's license. While still at the scene, he eventually gave his correct name and "said he gave a fictitious name because he had outstanding warrants in his name." Id. He was charged with obstruction of official business and moved to suppress all statements and any evidence gained by his seizure. This Court affirmed the denial of the motion finding that "at the time of the stop Click had no reasonable expectation of privacy in his vehicle because Click knew that there were outstanding warrants for his arrest." Id. We then held that in "view of the above we do not get to the issue of whether the exclusionary rule applies to evidence of an illegal act which occurred after the unlawful stop." A concurring opinion commented that "Click's decision to give a false identity * * * was not a product of the illegality or the officer's efforts to exploit it." Id.

{¶ 15} In *State v. Brown* (Jan. 28, 2000), Montgomery App. No. 17965, the trial court found that the officer "did not have the requisite reasonable suspicion to detain and question" the defendant. We held that when a warrant was subsequently discovered, "the warrant justified Brown's arrest" and that the search of the vehicle incident to arrest was lawful; the drugs that were found were not subject to suppression.

{¶ 16} In *State v. Jamison* (May 11, 2001), Montgomery App. No. 18453, appeal dismissed 93 Ohio St.3d 1413 (2001), the trial court found that the stop and pat down of Jamison were justified, but that the seizure of his identification card, as opposed to any weapons or contraband, exceeded *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Therefore, despite the fact that the officers determined, based on this identification, that there was a warrant for his arrest, the

subsequent search of his vehicle was unlawful. We cited *State v. Lynch* (June 6, 1998), Montgomery App. No. 17028, for the principle "that evidence unconstitutionally seized *before* a valid arrest under an outstanding warrant is subject to suppression" (emphasis in original); the court sustained the suppression because the discovery of the warrant "was made possible only" by using the identification card which "had been unlawfully retrieved." *Jamison,* supra.

{¶ 17} However, in *State v. Smith,* Montgomery App. No. 22434, 2008-Ohio-5523, ¶12, discretionary appeal not accepted; motion for limited remand to the court of appeals to resolve intradistrict conflict en banc denied as moot, 121 Ohio St.3d 1411, 2009-Ohio-805, we "specifically overrule[d Jamison] to the extent that it contradicts our holding in *Dayton v. Click* * * * ." We held that Smith "had no reasonable expectation of privacy in being free from being stopped arbitrarily by police since the police were authorized and directed by an Indiana court to arrest him. * * * A search incident to that arrest would have disclosed the guns and drugs recovered by the police." Id. at ¶11. Later that year, in a case where the officer learned of an outstanding warrant after the discovery of drugs, we held that "the existence of the warrant rendered [the officer's] search and seizure of the drugs lawful." *State v. Williams,* Montgomery App. No. 22535, 2008-Ohio-6030, ¶22, citing *Click*, supra, and *Smith,* supra.

{¶ 18} In *State v. Walker-Stokes,* 180 Ohio App.3d 36, 2008-Ohio-6552, ¶39, we said "we need not decide whether those difficulties [regarding lack of probable cause for a stop] rise to the level of reversible error." Even assuming an unlawful stop, a warrant was then found, the vehicle was searched, and a weapon was

found. Citing *Smith,* we held that *"because, as a matter of law*, an outstanding arrest warrant operates to deprive its subject of the reasonable expectation of privacy the Fourth Amendment protects, the exclusionary rule does not apply to the search and seizure of the subject that would otherwise be illegal because of a *Terry* violation." Id. at ¶40 (emphasis in original). The concurring opinion found the issue to be "vexingly close." Id. at ¶43.

{¶ 19} A trial court found in *State v. Harding,* 180 Ohio App.3d 497, 2009-Ohio-59, appeal not accepted, 121 Ohio St.3d 1504, 2009-Ohio-59; reconsideration denied 122 Ohio St.3d 1483, 2009-Ohio-2511, that a pedestrian was unlawfully stopped. When he supplied his name and social security number, which were transmitted to the dispatcher, a warrant was discovered. The defendant was arrested, and drugs were found on him. Finding that "[e]specially on close questions of law, the doctrine of stare decisis requires that we follow the latest holding of our court on an issue of law," we held that the "defendant had no reasonable expectation of privacy because he had an outstanding warrant for his arrest * * *" and thus it does "not matter that the police became aware of the warrant following, and as a result of, an otherwise unlawful detention." Id. at ¶¶19-22. See, also, *State v. Gray,* Montgomery App. No. 22688, 2009-Ohio-1411, ¶12, stating "[t]he mere existence of an outstanding warrant, in other words, renders a seizure lawful, whether or not the officer is aware of the warrant at the time of the seizure."

{¶ 20} An individual cannot complain of a search and request that anything seized be suppressed unless he or she has a reasonable and legitimate

expectation of privacy in the place searched or the thing seized. See, e.g., *Minnesota v. Carter* (1998), 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (appellant lacked standing to bring Fourth Amendment challenge based on search of another person's home because he had no reasonable expectation of privacy therein); *Rawlings v. Kentucky* (1980), 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (holding that petitioner could not challenge the search of another person's purse because he lacked a reasonable expectation of privacy with regard to the purse).

{¶ 21} However, when a person is seized (assuming it is a seizure[1] ), he or she has a reasonable expectation of privacy – to be let alone by the State – that has been violated. An individual "may not be detained even momentarily without reasonable, objective grounds for doing so." *Florida v. Royer* (1983), 460 U.S. 491, 498, 103 S.Ct.1319, 75 L.Ed.2d 229. As the Supreme Court reiterated in *Terry,* 392 U.S. at 9, "'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." (Quoting *Union Pacific R. Co. v. Botsford* (1891), 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734).

{¶ 22} Individuals do not forfeit this expectation of privacy merely because there is a warrant for their arrest. They may not know of the warrant (or even of the allegation that they committed a crime or failed to pay a ticket), or the warrant could have been issued (or failed to have been recalled) in error. Further, even if

---

[1] A consensual encounter is not a seizure of the person. *United States v. Mendenhall* (1988), 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497.

they are aware of the warrant and may know they are "guilty" of whatever it is the warrant alleges, they still can go about their business until lawfully arrested. Any other analysis would eliminate constitutional protections for individuals who, subsequent to their stop, search, and seizure, are determined to have a warrant or to be guilty. A Kansas appellate court's dissent observed that *Harding*'s effect "seems to be that a person wanted on an arrest warrant in Ohio has no Fourth Amendment protections against an unreasonable search and seizure." *State v. Moralez* (2010), 44 Kan.App.2d 1078, 1126, 242 P.3d 223, 251, review granted September 23, 2011.

{¶ 23} Obviously, as Justice Frankfurter famously observed, many people who raise Fourth Amendment claims are "not very nice people." *United States v. Rabinowitz* (1950), 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (dissenting opinion). Regardless, these protections apply to "those suspected or known to be offenders as well as the innocent." *Go-Bart Importing Co. v. United States* (1931), 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. "The occasional benefits that compliance with the Fourth Amendment confers upon the guilty must be recognized as a necessary consequence of guaranteeing constitutional protections for all members of our community." *United States v. Ivy* (C.A.6, 1998), 165 F.3d 397, 404.

{¶ 24} "The exclusionary rule suppresses evidence only when a constitutional violation is a proximate cause of the government's receipt of the evidence. However, rather than speak in terms of proximate cause in exclusionary rule cases, the court has spoken of 'attenuation' and 'dissipation of the taint.' Its

use of these metaphors apparently has led to no different results than it would have reached if it had just used more conventional causal language." Alschuler, *Herring v. United States: A Minnow or a Shark?,* 7 Ohio St. J.Crim.L. 463, fn 75 (Fall, 2009).

{¶ 25} For example, as far back as *Nardone v. United States* (1939), 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307, the court said that the causal connection between government's unlawful conduct and its proof could "become so attenuated as to dissipate the taint;" as when an independent intervening cause, such as a defendant's unprompted decision to confess or a witness's unprompted decision to cooperate, has broken the causal chain. *Wong Sun v. United States* (1963), 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police; "the more apt question" is whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint").

{¶ 26} The Sixth Circuit has directly addressed the question of "whether the discovery of a valid arrest warrant may serve to dissipate the taint of an unlawful detention." *United States v. Gross* (C.A.6, 2010), 624 F.3d 309. It held that "where there is a stop with no legal purpose, the discovery of a warrant during that stop will not constitute an intervening circumstance." Id. at 320. See, also, *United States v. Lopez* (C.A.10, 2006), 443 F.3d 1280 (where there was no reasonable suspicion or probable cause to detain a defendant, the continued detention of the defendant while an officer ran a warrants check constituted an unlawful seizure and

required suppression of drugs found incident to the arrest on the warrant); *United States v. Luckett* (C.A.9, 1973), 484 F.2d 89 (per curiam) (officer's knowledge that a man was subject to an outstanding bench warrant, which knowledge was acquired only after unlawfully seizing the man, did not retroactively render the seizure of the person reasonable under the Fourth Amendment). But, see, *United States v. Johnson* (C.A.7, 2004), 383 F.3d 538 (holding that discovery of a warrant during an illegal stop constituted intervening circumstance).

**{¶ 27}** "To hold otherwise would result in a rule that creates a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a 'police hunch' that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion. Despite a lack of reasonable suspicion, a well-established constitutional requirement, the officer may then seize those individuals, ask for their identifying information (which the individuals will feel coerced into giving as they will have been seized and will not feel free to leave or end the encounter), run their names through a warrant database, and then proceed to arrest and search those individuals for whom a warrant appears. Under this scenario, an officer need no longer have reasonable suspicion on probable cause, the very crux of our Fourth Amendment jurisprudence. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); [*United States v.] Williams* [2010], 615 F.3d [657] at 670, n. 6 ('[A]llowing information obtained from a suspect about an outstanding warrant to purge the taint of an unconstitutional search or seizure would have deleterious effects. It would encourage officers to seize individuals

without reasonable suspicion-not merely engage them in consensual encounters-and ask them about outstanding warrants.'); see, also, Kimberly, *Discovering Arrest Warrants: Intervening Police Conduct and Foreseeability,* 118 Yale L.J. 177 (2008) (commenting that a rule where the discovery of an outstanding warrant constitutes an intervening circumstance has the perverse effect of encouraging law enforcement officials to engage in illegal stops where they have an inarticulable hunch regarding a person on the street or in a car)." *Gross,* supra, at 321-22.

{¶ 28} The Arizona Supreme Court in *State v. Hummons* (2011), 227 Ariz. 78, 253 P.3d 275, analyzed whether an illegal stop is sufficiently attenuated from a subsequent search to avoid the exclusionary rule. Applying *Brown v. Illinois* (1975), 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416, the court considered three factors: the time elapsed between the illegality and the acquisition of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct.

{¶ 29} The court found that "in essentially every case" the time between the illegal stop and the discovery of the evidence is short and that the discovery of a valid arrest warrant is an intervening cause, but not one that can validate a search "i[f] the purpose of an illegal stop or seizure is to discover a warrant – in essence, to discover an intervening circumstance." Id. at ¶12. The court then examined the third factor, the purpose and flagrancy of the illegal conduct, and found that the officer did not approach the defendant "with the hope of arresting and searching him, nor did she otherwise engage in purposeful or flagrant illegality." Id. at ¶13.

Therefore, the illegal stop was sufficiently attenuated from the seizure, and the drugs found on the defendant incident to his arrest on the warrant should not be suppressed.

{¶ 30} The Sixth Circuit in *Gross,* supra, also applied *Brown,* but found that "where a stop has no legal purpose, the discovery of a warrant during that stop will not constitute an intervening circumstance" that would dissipate the taint of an unlawful detention. *Gross,* at 320-21. "* * * [H]olding that the discovery of a warrant after an illegal stop is an intervening circumstance so long as the purpose of the stop is not because the officer believes the suspect has an outstanding warrant would encourage an officer to offer alternative reasons for the stop, such as a police hunch or community-caretaking. Essentially, we will have created a system of post-hoc rationalization through which the Fourth Amendment's prohibition against illegal searches and seizures can be nullified." Id. at 321-22.

{¶ 31} *Click*'s progeny in this District (we can find no citations to it by any other appellate court) is labyrinthine, if not desultory. "Stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision." *Gallimore v. Children's Hosp. Med. Center* (1993), 67 Ohio St.3d 244, 257 (Moyer, C.J. dissenting). "Stare decisis remains a controlling doctrine in cases presenting questions on the law of contracts, property, and torts, but it is not controlling in cases presenting constitutional questions." *State v. Bodyke,* 126 Ohio St.3d 266, 275, 2010-Ohio-2424, ¶37. Because there is a constitutional protection underlying the proper application of the exclusionary rule, "stare decisis does not compel us with the same force as it does in other areas of the law." See, e.g., *State v.*

*Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, ¶45 (internal citations omitted).

{¶ 32} If an individual is unlawfully stopped and evidence is seized, it is subject to the exclusionary rule because of the Fourth Amendment violation. This is true even if, subsequent to the discovery of the contraband and the defendant's arrest, it is determined that there is a warrant for his or her arrest. The later-discovered warrant itself does not retroactively legitimize the search and seizure.

{¶ 33} None of this means that a defendant cannot be arrested for the outstanding warrant simply because his name was discovered as a result of an unlawful stop. "There is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity." *Hoosilapa v. I.N.S.* (C.A.9, 1978), 575 F.2d 735, 738. Most courts hold that *I.N.S. v. Lopez-Mendoza* (1984), 468 U.S. 1032, 1039, 104 S.Ct. 3479, 82 L.Ed.2d 778, stands for the proposition that "the body or identity of a defendant * * * in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest." See, e.g., *United States v. Oscar-Torres* (C.A.4, 2007), 507 F.3d 224 (fingerprints); *United States v. Navarro-Dias* (C.A.6, 2005), 420 F.3d 581 (denying motion to suppress "regardless of whether the information was obtained by a violation of his Fourth Amendment rights").

{¶ 34} This was recently before the United States Supreme Court. Jose Tolentino was unlawfully stopped, and his name and the fact that he was driving under suspension were discovered. The question before the court was whether that information, obtained only through his unlawful detention, could be used. The

case was accepted but then dismissed. *People v. Tolentino* (2010), 14 N.Y.3d 382, 900 N.Y.S.2d 708, 926 N.E.2d 1212, cert. granted ___ U.S. ___, 131 S.Ct. 595, 138 L.Ed.2d 433 (2010), cert. dismissed as improvidently granted ___ U.S. ___, 131 S.Ct. 1387, 179 L.Ed.2d 470 (2011).

{¶ 35} In *Herring v. United States* (2009), 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496, the majority held that unreasonable searches do not automatically trigger the exclusionary rule. See, e.g., *Nolasco,* et al., *What Herring Hath Wrought: An Analysis of Post-Herring Cases in the Federal Courts,* 38 Am.J.Crim.L. 221 (Spring, 2011). In *Herring,* the police relied on incorrect computer information that failed to reflect that a warrant had been recalled. The court stated that the exclusionary rule does not apply to unconstitutional searches resulting from mistakes due to "isolated negligence attenuated from the arrest." *Herring,* at 698. How this holding affects general Fourth Amendment law is open to debate. See, e.g., LaFave, *The Smell of a Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule,* 99 J.Crim.L & Criminology 757 (Summer, 2009), and Alschuler, supra.

{¶ 36} Regardless, we cannot speculate on what a higher court might eventually hold. Some courts have held that discovery of a warrant after an illegal arrest is the fruit of the poisonous tree; others have held that the warrant is an intervening and attenuating circumstance; and others have held that the flagrancy of the police conduct and/or the foreseeability[2] of the discovery of a warrant should

---

[2] See, e.g., Kimberly*, supra,* at fn 29, in which the author calculates the ratio of outstanding warrants to residents in Cincinnati as one to three, and suggests that it is thus not unforeseeable that a warrant check will discover an arrest warrant for the

control the applicability of the rule.

{¶ 37} Whether viewed as lack of proximate cause or as attenuation, there is a point, albeit perhaps ultimately subjective, at which the discovery of a warrant, and a search incident to arrest under the warrant, is so removed, unrelated, unforseen, and independent from the unlawful stop and seizure that the exclusionary rule is not applicable. In the case before us, the warrant was discovered as a direct, proximate and non-attenuated result of Gardner's seizure.

{¶ 38} In summary, Gardner had a reasonable expectation of privacy at the time of the stop despite there being a warrant for his arrest. Once the warrant was discovered, the law enforcement officers had the right to infringe upon that expectation, arrest him, and conduct a search incident to that arrest. However, if the warrant was discovered as a result of an unlawful stop or seizure (unless its discovery was unconnected to and attenuated from the illegality), then any evidence seized in the search incident to the arrest must be suppressed.

{¶ 39} We cannot tell from the record exactly when and how the officers discovered Gardner's name or that there was a warrant; whether the court found facts justifying – or not justifying – a *Terry* patdown; or whether, if such a patdown were justified, whether the seizure of the drugs was within the plain feel exception. We will reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . .

individual.

DONOVAN, J., concurs.

HALL, J., dissenting:

{¶ 40} At the time of his encounter with police, which led to the pat down and discovery of crack cocaine hidden in his shorts, the defendant had an outstanding warrant for his arrest. The warrant was not discovered until sometime after the pat down. This court held in *Dayton v. Click* (Oct. 5, 1994), Montgomery App. No. 14328, that a defendant with an outstanding arrest warrant does not have a reasonable expectation of privacy to be free from arrest and search. I recognize that the court has at times struggled with that decision. See, e.g., *State v. Jamison* (May 11, 2001) Montgomery App. No. 18453, overruled by *State v. Walker-Stokes*, 180 Ohio App.3d 36, 2008-Ohio-6552. But the case law of the court, reaffirmed repeatedly, is that when a defendant has an outstanding arrest warrant, he has "no reasonable expectation of privacy to be free from arrest and search by the police." *State v. Williams*, Montgomery App. No.22535, 2008-Ohio-6030, ¶ 22, citing *State v. Smith*, Montgomery App. No. 22434, 2008-Ohio-5523, ¶11. The majority opinion effectively overrules those holdings.

{¶ 41} In this record, there is no evidence that the police acted indiscriminately or in flagrant disregard of the defendant's rights. When a case with such police activity is presented to us, then will be the time to re-examine *Click, Smith*, and *Williams*.

{¶ 42} Based upon the above case law, I believe that the trial court correctly determined that the defendant did not have a reasonable expectation of privacy and, therefore, the trial court properly overruled the defendant's Motion to

Suppress. I would affirm.

. . . . . . . . . .

Copies mailed to:

Timothy J. Cole
Rebekah S. Neuherz
Hon. Timothy N. O'Connell